# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

**CIVIL ACTION NO. 3:09-CR-00015-JHM**

**UNITED STATES OF AMERICA**                              **PLAINTIFF**

**V.**

**STACEY JO SMILEY**                                          **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Stacey Jo Smiley's Motion to Withdraw Plea [DN 37] and the United States' Motion to Set for Sentencing [DN 54]. This matter having been fully briefed, and the Court having conducted an evidentiary hearing, this matter is ripe for decision. For the following reasons, Defendant's Motion to Withdraw Plea is **DENIED** and the United States' Motion to Set for Sentencing is **GRANTED**.

## I. BACKGROUND

On December 17, 2007, the Meade County Sheriff's Office (M.C.S.O.) and the Kentucky Office of Financial Investigations (O.F.I.) executed a search warrant on Defendant's home in connection with a mortgage fraud investigation. During the search, evidence was found that Defendant had used the identity of her minor child to fraudulently obtain a credit card in his name from Capital One. On February 2, 2009, the Defendant was indicted on one count of mail fraud, 18 U.S.C. § 1341; one count of aggravated identity theft, 18 U.S.C. § 1028A(a)(1) and (c)(5); and one count of forfeiture, 18 U.S.C. § 982 and § 853. On November 2, 2009, Defendant entered into a plea agreement, whereby she pled guilty to mail fraud and identity theft. On June 4, 2010, Defendant's counsel filed a motion to continue sentencing, which was granted. In support of that motion, defense counsel represented that the Defendant had provided them with several documents relating to the case

on June 3, 2010, and that defense counsel needed time to conduct due diligence regarding the documents.

Finally on July 19, 2010, Defendant filed a motion to set aside her plea. The motion to set aside her plea discussed potentially exculpatory evidence but did not disclose the evidence itself. The motion stated that it was filed against the advice of counsel. In conjunction with the motion to set aside plea, defense counsel also filed a motion to withdraw as counsel, which was granted. Defendant obtained substitute counsel who re-filed the motion to withdraw plea. In support of this second motion to withdraw plea, Defendant filed an affidavit stating that she had advised her former counsel that she was unable to locate documentation to support her claim that the credit card account was erroneously opened by Capital One in her son's name. She was told that without such documentation she would be unlikely to prevail at trial. Thus, she pled guilty to the charges. In her affidavit, she claims that after her change of plea, she recovered material from the M.C.S.O. which supports her contention. The Court granted her motion to withdraw her plea on November 8, 2010.

On November 12, 2010, the United States filed a motion to suspend the Court's order until an evidentiary hearing was conducted regarding the potentially exculpatory documents. The United States claimed the documents were forgeries; that the material produced as having been in the possession of the sheriff had not been seized during the search of Defendant's home; and that some of the proffered exculpatory evidence was not even in existence at the time the search warrant was executed. After reviewing the government's motion, the Court believed legitimate questions were raised as to the authenticity of the exculpatory documents and it granted the motion to suspend its order. An evidentiary hearing was held on January 20, 2011. After the hearing was concluded, the government filed a motion to set this matter for sentencing consistent with the plea agreement.

## II. DISCUSSION

"A defendant does not have an absolute right to withdraw a guilty plea." United States v. Ellis, 470 F.3d 275, 281 (6th Cir. 2006) (citations omitted). In this case, the Court has already accepted defendant's guilty plea, therefore, the defendant must show a "fair and just reason" in order to withdraw her guilty plea under Federal Rule of Criminal Procedure 11(d)(2)(B). This rule is designed "to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant 'to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes that he made a bad choice in pleading guilty.'" United States v. Alexander, 948 F.2d 1002, 1004 (6th Cir. 1991), cert. denied, 502 U.S. 1117, (1992) (citation omitted).

The defendant has the burden of proving that withdrawal of her guilty plea is justified, and the matter is left to the discretion of the court. In United States v. Bashara, the Sixth Circuit listed factors which should guide a district court in determining whether to allow a defendant to the withdraw a guilty plea: (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence or absence of a valid reason for the failure to move for withdrawal earlier in the proceeding; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has prior criminal experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted. 27 F.3d 1174 (6th Cir. 1994) *abrogated on other grounds by* United States v. Caseslorente, 220 F.3d 727 (6th Cir. 2000). The first six factors are used to determine whether defendant has presented a fair and just reason for withdrawal and the Court balances that with the last factor-any prejudice to the government.

3

## A. Exculpatory Evidence

The exculpatory evidence that Defendant contends presents a fair and just reason for the withdrawal of her plea is the following: (1) a copy of a Visa credit card in the name of Defendant, allegedly issued by Capital One; (2) a set of three pages that are allegedly parts of applications for life insurance to be taken out on behalf of Defendant's minor son; (3) a letter purportedly from Capital One, dated 1-3-08; (4) a transcript of two telephone conversations allegedly between Defendant and employees of Capital One; (5) an audio recording of one of the alleged telephone conversations between Defendant and Capital One; and (6) a letter written to the Kentucky Attorney General, dated 5-14-08, filing a complaint against Capital One.

The evidentiary hearing was held to determine the authenticity of Defendant's exculpatory material. In her affidavit filed in support of her motion to withdraw her guilty plea, Defendant maintained that she recovered the exculpatory material from the M.C.S.O. after she had entered her plea. The fact that this evidence was in the possession of law enforcement was the reason she gave for not being able to produce it prior to her guilty plea. However, in the face of the government's contention, Defendant's testimony at the hearing changed. At the hearing, she testified that a majority of the evidence was actually recovered from the office of an attorney named Jeremy Aldridge. Defendant testified that Mr. Aldridge was helping her with several legal matters during the relevant time in question, including the Capital One situation. In connection with the Capital One situation, Defendant testified that she gave Mr. Aldridge several documents as well as at least one audio tape. She claims that because several lawsuits were filed against her in an unrelated matter that she asked Mr. Aldridge to focus on defending those suits and to place the Capital One issue on the back-burner. Thereafter, she claims she forgot that she had worked with Mr. Aldridge on the Capital One issue and had given him several pieces of exculpatory evidence until she found his card in the

4

box of evidence recovered from the M.C.S.O. When she saw his card she immediately remembered that "he had some stuff" and she went to his office to retrieve her file. Defendant testified that she was able to recover the exculpatory material from the M.C.S.O. and Mr. Aldridge's office around late March or early April of 2010. Mr. Aldridge did not testify.

The government has argued that there is no fair and just reason to allow the Defendant to withdraw her plea because the documents she alleges are exculpatory are forgeries and because they were never in the government's possession. The government called several witnesses who testified to the following: (1) the documents appear to be forgeries; (2) the government did not seize the exculpatory material during the search of Defendant's home; and (3) some of the proffered exculpatory evidence was not even in existence at the time the search warrant was executed.

### 1. Copy of Credit Card in Stacey Smiley's name

The first piece of evidence that the government attacked was a photocopy of a Capital One Visa credit card in the name of Stacey Smiley, identified as government's exhibit 1. Richard Napolitano, a Capital One employee of over thirty years and custodian of records, testified that there were several things wrong with the photocopy that led him to believe it was a forgery. First and foremost, Capital One has no record of a Capital One Visa credit card matching those numbers issued in the name of Stacey Smiley. Furthermore, Mr. Napolitano stated that all Capital One Visa credit cards would have two dates listed on them, a "good from" date as well as a "good to" or expiration date. The photocopy of the card presented by Defendant only has an expiration date. However, the credit card in the name of her minor son, which Defendant claims was sent erroneously only months after her card was issued, contains both the "good from" and "good to" dates. Mr. Napolitano also testified that the words "valid thru" would precede the expiration date on a Capital One Visa credit card, but those words were not found on government's exhibit 1. The Court notes that the photocopy

5

is clear regarding the first twelve account digits but is not legible when it comes to the final four numbers identifying the account.

Ms. Gayle Keltner, an investigator with the O.F.I. who was responsible for identifying, inventorying, and examining each piece of evidence that was seized from the Defendant's home, testified that the photocopy of the credit card was not recovered during the search. Ms. Keltner further testified that had such an item been recovered that she would have turned it over to the government as she did with all of the other items pertaining to Capital One. At the hearing, despite having stated in her affidavit that all of the material was recovered from the sheriff's office, Defendant testified that she discovered the photocopy of the card in two locations, the box of evidence returned to her from the M.C.S.O. and from the file she recovered from Mr. Aldridge.

### 2. Security Investment Application

The next alleged exculpatory document, introduced as government's exhibit 2, is a three page document Defendant produced in support of her motion to withdraw her plea. Before the hearing, the government challenged this document because it bore a date of June 28, 2005, on the third page, but used a Capital One trademark on the first page which was not in existence until 2008. At the hearing, the government produced testimony from Mr. Napolitano that government's exhibit 2 was not an application for life insurance at all and that Capital One has no record of such a document ever having been submitted by Defendant. Mr. Napolitano testified that government's exhibit 2 is actually the first three pages of Capital One's security investment application. Interestingly, the fourth page of the application, which was not produced by Defendant, contains Capital One's revision date for the document. The government contends that Defendant obtained this application after her indictment and then backdated the signature lines, in an attempt, to create evidence that she had

6

spoken with Capital One regarding the Credit Card in her minor son's name. [1]

In response, at the hearing, Defendant contends that government's exhibit 2 is actually two separate documents. She claims that the first page of government's exhibit 2 is an application for life insurance on her son submitted sometime in 2008 and that page two and three of government's exhibit 2 is an application for life insurance on her son submitted in 2005. Defendant testified that the first page of the exhibit, which could not have existed at the time the M.C.S.O. and O.F.I. conducted the search of her home, was recovered from Mr. Aldridge's office, but that the other two pages, containing signatures dated 2005, were recovered in the evidence from the M.C.S.O.

### 3. Letter from Capital One dated 1-3-08

Government's exhibit 3, is a purported letter from Capital One, apologizing for sending a credit card to a minor, admitting that Defendant's intent was to have life insurance taken out on her minor son, and acknowledging that several calls and emails were made on behalf of Defendant to correct the situation. The first challenge to this letter is that it is dated January 3, 2008, therefore, it could not have been included in the materials that were seized by the M.C.S.O. and O.F.I. on December 17, 2007. In an effort to explain away this inconsistency, Defendant testified that she recovered this letter from Mr. Aldridge's office and not the box of evidence released by the M.C.S.O. Defendant further testified that this letter was sent to her via email to one of her own email accounts and that she printed off the "original" at Mr. Aldridge's office and left it with him.[2] If this is true,

---

[1] The Court confirmed the government's representation that a nearly identical securities investment application could be downloaded from Capital One's website.

[2] The Court finds it odd that the "original" letter produced by Defendant during the hearing, but not introduced into evidence, contained all of the qualities of an actual letter and not an email. It was on high quality paperstock, contained Capital One's logo in color, and was folded three times as it would be if it were sent in an envelope. However, Defendant's testimony is that it was printed off of an email account and placed inside a file at Mr. Aldridge's office.

7

then the Defendant had access to this document at any time by simply logging into her email account from any place containing an internet connection, or retrieving it from Mr. Aldridge. In any event, the fact remains that this evidence was never in the possession of the government.

The second challenge to the letter is that it is a forgery. Setting aside the many grammatical mistakes found in the body of the letter, Mr. Napolitano identified several issues with the letter that do not comport with Capital One company policy and that indicate to him that this letter is a forgery. For simplicity's sake, the Court will list the problems: (1) Capital One's policy is to include a Credit Card number or Customer Care number in the reference line to indicate what the letter is in response to, but exhibit 3 has neither number listed anywhere in the letter; (2) Capital One's policy when drafting letters of this type is to use the Capital One business address or the station address of the person authoring the letter, not the corporate headquarter's address, but exhibit 3 only uses the corporate headquarter's address; (3) the appropriate corporate entity that would be contacting Defendant would be Capital One Bank, but the letter states it was sent on behalf of Capital One Financial Corporation; (4) the supposed author of the letter, Joaell, does not exist, but a Capital One employee by the name of Jonell does exist; (5) while the ID number that is listed next to Joaell in the signature line does match Jonell's actual ID number, it is not Capital One's policy to include that ID number on such correspondence; (6) the letter's signature line lists Jonell as a supervisor but Jonell has never been a supervisor for Capital One in any capacity; (7) Mike Wall is listed as the Senior Vice President, District Manager of Capital One Financial Corporation, but Mike Wall has never held such a title with Capital One;[3] (8) although Jonell and Mike Wall both work on the credit card side

---

[3] While Defendant has produced evidence that Mike Wall is a Senior Vice President, District Manager of Capital One Bank, Capital One Bank and Capital One Financial Corporation are two separate entities and the alleged Capital One letter claims that Mike Wall is a Senior Vice President, District Manager of Capital One Financial Corporation. Mr. Napolitano testified

8

of Capital One, they have never worked on the same team and would not have been included in the same letter.

### 4. Transcripts of Telephone Calls

Government's exhibit 4 is a copy of two transcripts of calls allegedly between Defendant and Capital One representatives. In reading the transcripts, Mr. Napolitano testified that there are several indicators that these conversations were not actually with Capital One representatives. The first indicator is that the Capital One representative in the first transcript identifies himself/herself as Toni and gives a six digit ID number. It is Capital One's policy to only give an ID number after being asked to do so by the customer, a representative would not simply volunteer that number. Furthermore, the number identified in the transcript does not correspond to any known employee of Capital One.

There are several more instances where the alleged Capital One representative did not follow company policy. It is Capital One's policy that its representatives first confirm that the person on the telephone is an authorized user of the account before proceeding with the call. If it is determined that the person is not an authorized user, the call should be immediately terminated. Neither of those policies was followed in the transcripts. Once a customer identifies that his or her account is being handled in a specific department, such as the fraud department, the call should immediately be transferred to that department. Defendant identified that her account was currently being handled by the fraud department in the transcript, however, the representative did not transfer her, but instead handled the call for its entirety. Furthermore, in one of the transcripts there is reference made to a supervisor named Joaell. Mr. Napolitano reiterated that there is no Joaell and that Jonell has never

---

that Mike Wall has never held that title.

been a supervisor.

Defendant testified that she found one of the two transcripts in the box of evidence returned from the M.C.S.O. and the other transcript was recovered from Mr. Aldridge's office. Defendant's testimony on this issue was rather confusing. She testified that she couldn't remember exactly which transcript was where, but that one was in the box and one was with Mr. Aldridge.

### 5. Audio Recording of Conversation with Capital One

The government admitted an audio recording of a micro-cassette with the words Capital One written on it as government's exhibit 9. Defendant claimed that the audio was a conversation between herself and Capital One. Defendant testified that she created the recording using a dictaphone. The audio was unintelligible to the Court. While there appeared to be two persons speaking, the content of their conversation was not decipherable. In contrast, the government played the audio on the micro-cassette that immediately followed the alleged Capital One conversation, which was a crystal clear conversation between Defendant and her minor son. Defendant testified that one of the transcripts from government's exhibit 4 was a transcript of the Capital One conversation played for the Court. No transcript could have been made from the recording the Court heard.

Ms. Keltner, who conducted the investigation of Defendant for O.F.I., testified that no tape was recovered during the search of Defendant's home with the words "Capital One" written on it. She further testified that she personally listened to every tape that was recovered during the search of Defendant's home, and that she had never heard this tape prior to the government giving her a copy. Chief Deputy Dan McCubbin of the M.C.S.O. also testified that he remembers seeing no micro-cassettes with writing on them in the box of evidence returned to Defendant. In response, and despite her affidavit claiming that all the exculpatory evidence was recovered from the sheriff's

office, Defendant testified at the hearing that she recovered the audio tape from Mr. Aldridge's office.

## 6. Letter to Attorney General Dated 5-14-08

The final piece of alleged exculpatory evidence is a letter addressed to the Kentucky Attorney General's office dated May 14, 2008, admitted as government's exhibit 5. The letter is written either by or on behalf of Defendant and complains of Capital One's behavior. Ms. Keltner testified that the Attorney General's office has no record of ever receiving the letter. When asked where she recovered this letter, the Defendant testified first that she found it in the box of evidence from the M.C.S.O. in a jumble of papers. Then when immediately asked again, she said that this particular letter to the Attorney General was actually recovered from Mr. Aldridge's office and the letter she found in the box of evidence was the letter written to the Better Business Bureau. Defendant never produced the letter written to the B.B.B. allegedly found in the box of evidence. This particular letter to the Attorney General could not have been recovered from the M.C.S.O. as it is dated after the search of Defendant's home occurred and Officer McCubbin testified that no evidence was added to the box.

One of the numerous problems involving the authenticity of the exculpatory materials is where the exculpatory materials were actually found. As previously noted, in her affidavit filed in support of the motion to withdraw her plea, Defendant states that the exculpatory evidence was recovered from the M.C.S.O. She further states that the exculpatory materials were in the possession of the government prior to Defendant's plea and were not provided during the course of discovery. At the outset of the hearing, defense counsel notified the Court that there was one mistake with the Affidavit. Defense counsel stated that after reviewing his notes and speaking with his client, he determined that one document was not actually recovered from the M.C.S.O., but was instead recovered from Defendant's former attorney, Mr. Aldridge. However, when the Defendant took the stand, she testified that not only was the letter from Capital One recovered from Mr. Aldridge's

11

office, but so to was the first page of the securities investment/alleged life insurance application, one of the transcripts, the audio recording that matched the second transcript, the letter to the Attorney General, and a second photocopy of her alleged Capital One Visa credit card. Although her affidavit and the memorandum in support of her motion to withdraw plea state that the government withheld the exculpatory evidence prior to Defendant's plea of guilty, it was Defendant's testimony that only a photocopy of a Capital One Visa credit card, two pages of an alleged application for life insurance, and one transcript were recovered from the M.C.S.O.

In order to believe that any of these items existed prior to the search and were in the possession of either the M.C.S.O. or Mr. Aldridge, one must be willing to find the Defendant worthy of belief. However, based on the record as it now exists, and after considering all the testimony at the hearing, the Court concludes that the Defendant is simply not credible. Her story shifted dramatically in response to each challenge made by the government. It seemed a blatant and obvious attempt to mold her story to fit within the parameters of the testimony of each government witnesses who challenged aspects of her prior story. The Court finds that the government produced credible evidence to show, in all likelihood, that most, if not all, of the items the Defendant produced as potentially exculpatory are either forgeries or items fabricated and collected by her in an attempt to withdraw her plea and manufacture a defense. One might ask, as defense counsel did, why, if she was going to go to these extremes, did she not do so before entering her plea. That is indeed a good question, but one explanation is perhaps the certainty of a two-year prison sentence began to weigh heavily on her mind and motivated her deception. Another explanation is that the Defendant is telling the truth, which is a thought the Court is not willing to accept.

Obviously, since the Court believes the exculpatory evidence was fabricated by the Defendant, an analysis of the <u>Bashara</u> factors to determine if she has shown a fair and just reason to

12

allow her to withdraw her plea would be an unnecessary exercise. Falsifying documents could never provide one with a fair and just reason to withdraw a plea. Therefore, the following analysis of the Bashara factors will be conducted as if the materials were not fabricated.

**B. Bashara Factors**

The first factor to be considered under Bashara is the amount of time between the plea and the motion to withdraw the plea. In this case, Defendant entered her guilty plea on November 2, 2009 and filed her first motion to withdraw her plea on July 19, 2010. There is an eight month gap between the entering of the plea and the motion to withdraw. However, Defendant contends that this factor should be examined from the time the Defendant obtained the exculpatory material, not the entry of her guilty plea. Defendant argues that it was not until her recovery of the exculpatory material that she was even able to file a motion to withdraw her plea.

In her memorandum in support of the motion to withdraw plea, Defendant asserts that "[o]nly days after discovery of the exculpatory materials, [Defendant] advised her then counsel of her desire to withdraw from her guilty plea." Def.'s Mem. Supp. Mot. Withdraw Plea 5 [DN 37]. The record reflects that Defendant's former defense counsel was notified of the exculpatory evidence on June 3, 2010. Def.'s Mot. Cont. Sent. 1 [DN 22] ("[Defendant] provided the undersigned with several documents and other material related to this case yesterday.") Defendant's testimony at the hearing was that she recovered the items from the M.C.S.O. and Mr. Aldridge's office only days apart in late March or early April. It appears that if Defendant's testimony is to be believed, she had the alleged exculpatory materials approximately sixty days prior to turning them over to her previous counsel, although her memorandum in support stated otherwise.

This sixty day gap between the discovery of the materials and Defendant's disclosure of them to former defense counsel is substantial. The Sixth Circuit has generally denied motions to vacate

13

"if a substantial period of time has elapsed prior to the entry of the motions." United States v. Collins, 311 F. App'x 741, 743 (6th Cir. 2008) (citing United States v. Durham, 178 F.3d 796, 798-99 (6th Cir. 1999) (seventy-seven days); United States v. Baez, 87 F.3d 805, 808 (6th Cir. 1996) (sixty-seven days); United States v. Goldberg, 862 F.2d 101, 104 (6th Cir. 1988) (fifty-five days); United States v. Spencer, 836 F.2d 236, 239 (6th Cir. 1987) (five weeks)). The Court believes that even if it were to base its analysis of this factor on Defendant's alleged discovery of the materials and her disclosure to counsel, the time difference of sixty days is unreasonable.

Under the second Bashara factor, "[e]ven when the defendant files his motion after a substantial period of time, the court considers any valid explanation for his failure to move earlier in the proceedings." Collins, 311 F. App'x at 744. Defendant's briefs on this issue rely heavily on the argument that Defendant was unable to obtain the alleged exculpatory materials prior to her plea because they were in the possession of the government. Defendant argues in her memorandum that her valid explanation for her failure to move to withdraw her plea earlier was "the nondisclosure of exculpatory evidence in the possession of the government." Def. Mem. in Support of Mot. Withdraw Plea 10. Defense Counsel was adamant in explaining to the Court that "**THE MATERIALS UPON WHICH THE** [sic] **SMILEY RELIES CAME FROM THE UNITED STATES**." Def.'s Resp. to United States Mot. to Suspend Order 1 [DN 46] (emphasis in original). However, Defendant's own testimony at the evidentiary hearing was that the letter from Capital One, two pages of a securities investment/alleged life insurance application, one transcript, the alleged audio recording of a conversation with Capital One, the letter to the Kentucky Attorney General, and a photocopy of Defendant's alleged Capital One Visa credit card were all in the possession of Defendant's former attorney Mr. Aldridge. The Court finds these materials were easily available to Defendant at all times prior to the entry of her guilty plea. Defendant has shown no reason why she was unable to obtain

14

the materials from Mr. Aldridge other than her testimony that she simply forgot he had them until she saw his business card. This does not present a valid explanation for Defendant's delay in seeking to withdraw her plea.

The third <u>Bashara</u> factor is whether Defendant has asserted or maintained her innocence over the course of the proceedings. There is evidence that Defendant maintained her innocence throughout the course of the proceedings, at least in conversation with her own attorneys. However, at her change of plea hearing, Defendant, was read the factual basis which stated that "a deputy uncovered that [Defendant] had used the identity, including personal identifiers, of one of her children, L.M., to fraudulently obtain and use a credit card via the mail from Capital One Bank." Under oath, Defendant was then asked by the Court, "[d]o you disagree with anything that he just said?" to which Defendant responded "No." Defendant was then asked how she pled, to which she responded "Guilty." While Defendant may have maintained her innocence in private, she gave no indication of such an intent during her change of plea hearing, while under oath. At best, Defendant has shown that this factor is neutral and favors neither herself nor the government.

The fourth <u>Bashara</u> factor requires that the Court consider the circumstances underlying the entry of the guilty plea. Defendant has produced testimony that she maintained her innocence to her own attorneys and claimed that exculpatory material existed. However, her attorneys informed her that the case the government had built against her was overwhelming. The plea deal that was struck allowed for the minimal sentence possible to be imposed. Even after Defendant produced the alleged exculpatory materials, her former attorneys felt that it was still in her best interest to stick to the plea agreement. It appears that Defendant received good advice regarding the plea agreement and that she was not deceived or confused regarding the consequences of her plea.

The fifth and sixth factors to be considered are the Defendant's nature and background as well

15

as her prior experience with the criminal justice system. Defendant finished high school and attended at least one year of college. At her change of plea hearing, Defendant testified that she was not under any physical or mental ailments that precluded her from understanding the nature of her actions. She further testified that she had read the agreement and fully understood its terms and the sentence for which it called. Furthermore, Defendant had prior experience with the criminal justice system. Defendant has been convicted of multiple felonies in the Commonwealth of Kentucky, including convictions for perjury, theft, and tampering with physical evidence. The Court finds that Defendant was able to comprehend the agreement and was even familiar with the process of pleading guilty,[4] and that Defendant's nature, background, and experience with the criminal justice system all warrant that her motion to withdraw her plea be denied.

The Court finds that an examination of the above six factors demonstrates the absence of a fair and just reason to allow the withdrawal of Defendant's plea. Having found no fair and just reason, the Court need not consider the final factor, the potential prejudice to the government. United States v. Ellis, 470 F.3d 275, 285-86 (6th Cir. 2006). "[T]he government is not required to establish prejudice that would result from a plea withdrawal, unless and until the defendant advances and establishes a fair and just reason for allowing the withdrawal." Id. (citation omitted). Finding no fair and just reason to allow Defendant to withdraw her plea, the Court grants the government's motion to set this matter for sentencing, which will be done by separate order.

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Defendant's Motion to Withdraw Plea [DN 37] is **DENIED**;

---

[4] Defendant testified at the evidentiary hearing that she had previously pled guilty to at least one charge in state court.

**IT IS FURTHER ORDERED** that the United States' Motion to Set for Sentencing [DN 54] is **GRANTED**.

cc: counsel of record